CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

October 16, 2024
LAURA A. AUSTIN, CLERK
BY:
s/A. Beeson
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **DEONTA JEROME HICKS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 7:22cv00235** |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **STACY DAY, et al.,** | ) | |
| **Defendants.** | ) | **By: Pamela Meade Sargent** |
| | ) | **United States Magistrate Judge** |
| | ) | |

Plaintiff, Deonta Jerome Hicks, ("Hicks"), a Virginia inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against multiple Virginia Department of Correction, ("VDOC"), employees. Only Hicks's claims against defendants Stacy Day, ("Day"), and Eric Miller, ("Miller"), remain.[1] This matter currently is before the court on Defendants Day And Miller's Motion For Summary Judgment, (Docket Item No. 81) ("Motion"), to which Hicks has responded, (Docket Item No. 98) ("Response").[2] This case is before the magistrate judge on transfer by consent of the parties, pursuant to 28 U.S.C. § 636(c). Pursuant to Order entered on December 12, 2022, (Docket Item No. 28), the case was transferred to the undersigned magistrate judge to handle the proceedings herein, including dispositive orders, pursuant to 28 U.S.C. § 636(c)(1). Upon review of the Motion, and for the reasons stated herein and the evidence presented, the Motion is **GRANTED IN PART and DENIED IN PART**.

---

[1] By Order entered February 13, 2023, Hicks's claims against defendants Keith Almarode, Brian Clark and Rick White were dismissed. (Docket Item No. 40.)

[2] Hicks filed a document titled a "Motion In Treverse," along with an affidavit from a fellow inmate, in support of his claims.

## I.   Facts

At all times relevant to his Second Amended Complaint, (Docket Item No. 74) ("Complaint"),[3] which was made under penalty of perjury, Hicks was housed at Red Onion State Prison, ("Red Onion").  In his Complaint, Hicks alleges that, on January 20, 2022, while working in the kitchen at Red Onion, he noticed that the majority of the kitchen ventilation system had black mold, causing irreparable harm to his respiratory system.  (Complaint at 3.)  He states he was assessed and treated by the prison Medical Department for "sinus issues" due to problems related to the black mold "sometime in February."  (Complaint at 5.)  He made a Written Complaint to this effect, dated February 8, 2022, in which he stated this could lead to cancer later on in life due to the toxicity of the black mold.  (Complaint at 3.)  This Written Complaint, ROSP-22-INF-00201, is attached to an Affidavit provided by the defendants and states, in relevant part, that this "mold infestation" was causing "irreparable harm to [his] respiratory system" and could, over time, lead to "asbestosis, mesothelioma, and lung cancer."  (Docket Item No. 82-2 at 12.)  In his Complaint before the court, Hicks alleges that the black mold was not isolated to the kitchen area at Red Onion, but was "throughout the cells, showers, ventilation system of the pods and majority of the building structures."  (Complaint at 3.)  When he did not receive a response to his Written Complaint,[4] he filed a Regular

---

[3] In its Order dated January 5, 2024, (Docket Item No. 73), the court stated that Hicks's Second Amended Complaint replaced the Amended Complaint and any amendments, and it constituted the sole complaint in this action.  Thus, it will be referred to as the Complaint.

[4] The Written Complaint provided by the defendants includes a Response from Brian Clark, the Institutional Safety Specialist at Red Onion, dated March 25, 2022.  This Response states that Red Onion was undergoing water renovations and had just completed a roofing project for all buildings.  He further stated that all the HVAC units on all roofs had been replaced, and a team of environmentalists and industrial hygienists would be conducting mildew, mold and air quality testing the following week to ensure they "stay[ed] in compliance."  (Docket Item No. 82-2 at 12.)

Grievance.  (Complaint at 3.)  However, Hicks claims this Grievance was rejected at intake for expired filing period, a finding which was upheld on appeal.[5] (Complaint at 4.)

Hicks alleges that he wrote to the Investigation Department on January 25, 2022, requesting that photographs of the "mold infestation" be taken, including, but not limited to, the showers, ceilings in the showers, the foundations of all the housing units facing the recreation yard and all the ventilation system in the kitchen. (Complaint at 4.)  On or about February 1, 2022, investigators took photographs of the black mold in the kitchen.  (Complaint at 4.)  However, according to Hicks, on two separate occasions, Red Onion personnel had cadets from Camp #18 paint over the black mold in the kitchen to hide it from him and the court, thereby preventing him from demonstrating the prison conditions that exposed him to serious harm. (Complaint at 4-5.)  Hicks alleges that, due to his request for photographs and his Complaint about the black mold in the kitchen, his kitchen job was not reinstated after an incident that occurred on January 20, 2022.  (Complaint at 4.)  According to Hicks, he was suspended from his job on January 20, 2022, after being written a disciplinary offense.  (Complaint at 6.)  However, on or about February 3, 2022, the disciplinary offense was resolved by informal resolution, meaning the infraction did not go on his record.  (Complaint at 6-7.)  Therefore, Hicks claims that, per policy, he was "to have [his] employment reinstated."  (Complaint at 7.)  However, he states that he was never given a termination/suspension form according to policy to appeal

_____

[5] Neither the Grievance nor the Appeals decision has been provided to the court, but the defendants did provide Hicks's "Level One Grievance Intake Appeal," dated April 5, 2022, in which he states he filed a Grievance after receiving no response to his Written Complaint, which was due February 23, 2022.  He further states his Grievance was denied at all levels, and he wished to exhaust his administrative remedies for legal matters on the issue.  (Docket Item No. 82-2 at 13.)

the termination/suspension pursuant to "041_F16_11-16."[6] (Complaint at 7.) Hicks alleges that his job was withheld in retaliation for his complaints about the black mold. (Complaint at 4,7.)

Hicks further states that, on January 10, 2022, he made the same Written Complaint, stating that black mold existed throughout the facility. (Complaint at 5.) He alleges that defendant Miller, Unit Manager of B Building, called him to his office on January 25, 2022, between 3:00 and 5:00 p.m. and instructed him to focus his mold complaints at the kitchen, and leave B Building out of the Written Complaints, or he would remove Hicks from the Positive Behavior Unit, ("PBU"),[7] by giving him a false infraction. (Complaint at 5.) Hicks said that, to avoid any trouble, he withdrew Complaint ROSP-22-INF-00122, dealing with black mold in B Building.[8] (Complaint at 5, 7.) He said he had written several requests to the Investigation Department, requesting the camera footage to be saved for evidence,[9] but Hicks said most of these requests were ignored. (Complaint at 5, 7.) Although Hicks refers to "Exhibits" at this point in the Complaint, no Exhibits are attached to his Complaint.

Hicks further alleges in his Complaint that, on or about April 18, 2022, Miller, in retaliation for Hicks's black mold complaints, directed Corrections Officer

---

[6] Hicks neither provides the policy to which he refers, nor does he explain its contents.

[7] The PBU, the B-6 Housing Unit at Red Onion, is an incentive pod, in which inmates are awarded extra incentives for good behavior. All kitchen workers live in the PBU. (Docket Item No. 82-4, ("Miller Affidavit"), at 1-2.)

[8] This Written Complaint has not been provided to the court.

[9] It appears that Hicks is claiming he requested camera footage showing that he met with Miller in his office on January 25, 2022, between 3:00 and 5:00 p.m.

Edwards to write Hicks a false disciplinary offense for having his cell light covered when, at the time, Hicks had left the cell for pod recreation, and his cellmate, Jamar Shelton, admitted to having the cell light covered. (Complaint at 7-8.) Hicks alleges that, on April 25 or 28, 2022, he was moved from the PBU to the A-1 Pod before being found guilty of the offense, which violated policy, and in retaliation for him exhausting the grievance procedure for the black mold issue. (Complaint at 8.) According to Hicks, the black mold was worse in the A-1 Pod than in the PBU. (Complaint at 8.) The showers were infested with black mold, and the black mold was "eating at the base board[s] of the pod." (Complaint at 8.) Hicks made a Written Complaint, ROSP-22-INF-00757, dated April 28, 2022, in which he complained of black mod in the A-1 Pod and the irreparable harm it causes to the respiratory system. (Docket Item No. 82-2 at 11.) Clark responded on May 9, 2022, stating, among other things, that testing for black mold was completed in April and showed no black mold or anything that was dangerous to staff or inmate health. Clark also stated that air quality testing revealed that air in the housing units was better than the air outside. (Docket Item No. 82-2 at 11.)

Hicks claims that defendant Stacy Day, Unit Manager of A Building, retaliated against him by failing to fix the black mold issue when Hicks grieved the issue in A Building. (Complaint at 8.) According to Hicks, Day knew the harm to Hicks's health the black mold would cause, but failed to remedy the matter. (Complaint at 8.) Instead, Day retaliated against Hicks by not returning him to the PBU once Hicks's adjustment hearing was not conducted within the 30-day time frame per policy. (Complaint at 8.) According to Hicks, Day ensured that Hearings Officer Adams found Hicks guilty of the 120B infraction so he was removed from the PBU. (Complaint at 8.)

In support of their Motion, the defendants filed Affidavits from Keith Almarode, the Food Operations Director at Red Onion, (Docket Item No. 82-1) ("Almarode Affidavit"); Brian Clark, the Institutional Safety Specialist/Environmental Coordinator at Red Onion, (Docket Item No. 82-2) ("Clark Affidavit"); Stacy L. Day, Unit Manager for A Building at Red Onion, (Docket Item No. 82-3) ("Day Affidavit"); and Eric A. Miller, former Unit Manager of B Building at Red Onion.

In his Affidavit, Almarode states that VDOC records reflect that Hicks was employed as a line server in the kitchen at Red Onion from December 13, 2021, to January 30, 2022. (Almarode Affidavit at 1.) Almarode does not recall either Hicks or his complaints about black mold, but records indicate that Correctional Officer Bray charged Hicks with 205 Disciplinary Offense for Delaying and Hindering the serving of meals and attempting to hide a food cart with meal trays from staff on January 20, 2022. (Almarode Affidavit at 1-2.) Almarode recommended on January 24, 2022, that Hicks be terminated from his kitchen job based on this charge. (Almarode Affidavit at 2.) According to Almarode, all kitchen workers live in the PBU, located in the B-6 Pod, and any disciplinary charge could result in an inmate being removed therefrom. (Almarode Affidavit at 2.) On February 7, 2022, Hicks made Written Complaint ROSP-22-INF-00219 concerning his removal from his kitchen job, to which M. Owens, the Assistant Director of Food Operations, responded. (Almarode Affidavit at 2; Docket Item No. 82-1 at 4.) An informal resolution was offered for the 205 disciplinary charge. (Almarode Affidavit at 2.) According to Almarode, this charge would not have prevented Hicks from reapplying for his kitchen job, but the application first would be reviewed by other administrative staff, including the Major and Intelligence staff, to determine eligibility, before being sent to Almarode for approval. (Almarode Affidavit at 2.)

Almarode states that, while it is not unusual for inmates who have been terminated from the kitchen to be rehired, he neither recalls receiving an application to rehire Hicks after his termination on January 30, 2022, nor does he recall deciding not to rehire him. (Almarode Affidavit at 2.) Similarly, a review of paperwork revealed nothing indicating that Hicks reapplied for his job or was so denied. (Almarode Affidavit at 2.)

Almarode states that, according to the Virginia CORIS database, Hicks currently is employed as a line server in the kitchen at River North Correctional Center, ("River North").[10] (Almarode Affidavit at 2.) According to Almarode, if Hicks had complained to him or others about the presence of black mold in the kitchen, it would have had no bearing on Hicks's job or his job performance. (Almarode Affidavit at 3.) Almarode states he would not want to work in an environment with toxic black mold. (Almarode Affidavit at 3.)

In his Affidavit, Clark states that, during renovations at Red Onion, in which contractors installed new roofing and replaced all HVAC units on all roofs for the housing units, leaks occurred during the removal of the old roofing. (Clark Affidavit at 1.) Due to these leaks, there were concerns about possible mold growth within the facility. (Clark Affidavit at 1.) Mold growth was visible inside some areas of the prison, including A and B Buildings. (Clark Affidavit at 1.) Therefore, inspection, evaluation and testing were conducted by an outside contractor and subcontractor, including in the A-1 and B-6 Pods, and a remediation work plan was implemented based on the test results. (Clark Affidavit at 1.) The remediation work plan is attached to Clark's Affidavit. (Docket Item No. 82-2 at 3-10.) As stated

---

[10] Hicks informed the court by letter, received February 8, 2023, that he had been transferred to River North. (Docket Item No. 37.)

previously, on March 25 and May 9, 2022, Clark responded to Written Complaints ROSP-22-INF-00757 and ROSP-22-INF-00201 from Hicks, regarding his concerns about mold in the kitchen and the A-1 Pod.  (Clark Affidavit at 2; Docket Item No. 82-2 at 11-12.)  The lab results of the samples collected on March 31, 2022, indicated that there was no black mold, also known as Stachybotrys, found at Red Onion.  (Clark Affidavit at 2; Docket Item No. 82-2 at 14.)  According to the report from the contractor, the molds found at Red Onion were common molds found in the environment and common allergen molds.  (Clark Affidavit at 2; Docket Item No. 82-2 at 14.)  The report further indicates that the air samples collected inside the facility had airborne mold levels much lower than those in the sample collected outside of the facility.  (Clark Affidavit at 2; Docket Item No. 82-2 at 14.)

In his Affidavit, Day, the A Building Unit Manager at all times relevant to Hicks's Complaint, states that VDOC records indicate that Hicks was housed in A Building from April 28, 2022, until he was transferred to River North on August 18, 2022.  (Day Affidavit at 1.)  Prior to April 28, 2022, Hicks was housed in the PBU.  (Day Affidavit at 1.)  Day neither specifically recalls Hicks, nor does he recall having any conversations with him about his claims of black mold in the housing unit.  (Day Affidavit at 2.)  Day states that Hicks was not eligible to return to the PBU because he had incurred a 120B charge on April 18, 2022.  (Day Affidavit at 2.)  According to Day, in order to be eligible to be housed in the PBU, an inmate must be charge-, not necessarily conviction-, free for 12 months, or charge-free for six months and have a kitchen job.  (Day Affidavit at 2.)  In addition to meeting these eligibility requirements, Day states that he also would have had to collaborate with Unit Manager Miller in B Building to determine bed space availability and cellmate compatibility for an inmate seeking assignment to the PBU.  (Day Affidavit at 2.)  At the time of Day's Affidavit in April 2023, he stated there was a wait list of 16 to

20 months for eligible inmates to be assigned to the PBU.  (Day Affidavit at 2.)  He states that a wait list for the PBU is common, and there likely was one at the time Hicks alleges Day should have returned him to the PBU, although Day did not know what the wait list was at that time.  (Day Affidavit at 2.)

Regarding Hicks's allegation that Day ensured that Inmate Hearings Officer Adams found Hicks guilty of the 120B charge, Day states he had no involvement in writing or processing the charge, as Hicks received this disciplinary offense when he was housed in B Building.  (Day Affidavit at 2.)  He states that, if the charge had been written while Hicks was housed in A Building, where he was the Unit Manager, he would be responsible for conducting the Institutional Review of the Inmate Hearings Officer's decision and penalty.  (Day Affidavit at 2.)  However, Day states that he did not review Hicks's charge or discuss any aspect of it with Inmate Hearings Officer Adams.  (Day Affidavit at 2.)  Day states that he did not retaliate against Hicks for writing Grievances or complaining about alleged black mold at Red Onion.  (Day Affidavit at 2.)  He does not recall responding to any Grievances or Written Complaints from Hicks regarding mold.  (Day Affidavit at 2.)  While he is aware that there was a black substance in some areas of A Building in 2022, evaluation and testing determined it was not black mold.  (Day Affidavit at 2-3.)  Day states that he works in the areas Hicks complained about, and he would not want to work in an environment with toxic black mold.  (Day Affidavit at 3.)  Even with the charges Hicks received in B Building, Day stated that Hicks was transferred to River North in August 2022, a lower security prison than Red Onion.  (Day Affidavit at 3.)

In his Affidavit, Miller, the B Building Unit Manager at Red Onion until November 2022, states that, as such, it was common practice for him to speak with

inmates in his office, especially if an inmate had a complaint. (Miller Affidavit at 1.) As stated previously, the B-6 Pod is the PBU, an incentive pod, where all the kitchen workers live. (Miller Affidavit at 1-2.) Generally, inmates must exhibit positive behavior and be charge-free for 12 months to be assigned to the PBU, unless they are a kitchen worker. (Miller Affidavit at 2.) An inmate may be removed from the PBU for any reason, and receiving a charge, even if it is later dismissed, may result in an inmate's removal to another pod. (Miller Affidavit at 2.) VDOC records show that, on January 20, 2022, Hicks received a 205 Disciplinary Offense for Delaying, Hindering or Interfering with an employee in the performance of his duties, after Corrections Officer Bray was notified by the floor officer that he could not find his food cart for the lunch meal anywhere in the kitchen. (Miller Affidavit at 2; Docket Item No. 82-4 at 4-6.) The food cart was located pressed up against the wall with the identifying tag hidden, and the trays also were boxed in with three extra food cart boxes in an attempt to hide them from staff. (Miller Affidavit at 2; Docket Item No. 82-4 at 4-6.) Hicks was one of the inmates who pushed the cart to the location to hide it. (Miller Affidavit at 2; Docket Item No. 82-4 at 6.) Hicks received an informal resolution to the charge, and he was terminated from his kitchen job. (Miller Affidavit at 2; Docket Item No. 82-4 at 5-6.) However, Hicks was permitted to remain in the PBU at that time because he received an informal resolution. (Miller Affidavit at 2.)

On April 18, 2022, Hicks was charged with a 120B Disciplinary Offense for Tampering with Security Materials, Devices or Equipment, for having the light fixture in his cell covered. (Miller Affidavit at 2; Docket Item No. 82-4 at 7-8.) Per the Disciplinary Offense Report, at approximately 2:40 p.m. on April 18, 2022, Major King, Sergeant Cornett and Miller were conducting rounds on the top tier of the PBU when Miller noticed the cell light in Hicks's cell was covered. (Miller

Affidavit at 2; Docket Item No. 82-4 at 7.)   When Hicks and his cellmate were questioned, Hicks admitted he was the one who covered the cell light, and based on this admission, Hicks received a disciplinary charge.   (Miller Affidavit at 2-3; Docket Item No. 82-4 at 7.)   Because inmates are required to remain charge-free while in the PBU, on April 28, 2022, Hicks was moved to A Building.   (Miller Affidavit at 3.)   Miller states he did not retaliate against Hicks for his complaints about mold in B Building, nor did he threaten to charge him with false infractions or tell him to stop writing Complaints.   (Miller Affidavit at 3.)   Miller states that, instead, Hicks was moved from the PBU after he received two disciplinary charges, which made him ineligible to remain in the PBU.   (Miller Affidavit at 3.)   Miller states that he would not want to work or be in an environment with toxic black mold; however, the black substance in B Building was tested and evaluated by specialists and was determined to not be black mold.   (Miller Affidavit at 3.)

As stated herein, in response to the Motion, Hicks filed a document entitled a "Motion In Treverse," in which he makes the same allegations as contained in his Complaint.   Attached to this Motion In Treverse is a sworn Affidavit from Taqwa Ubuntu, another inmate housed at Red Onion at the time relevant to Hicks's claims. (Docket Item No. 98-1) ("Ubuntu Affidavit").   Ubuntu states he has firsthand knowledge of the black mold issues in the kitchen area and the PBU at Red Onion. (Ubuntu Affidavit at 1.)   According to Ubuntu, personnel at Red Onion, as well as the named defendants, retaliated against Hicks by placing a false infraction on Hicks, removing him from the PBU and terminating his kitchen employment, despite Hicks receiving an informal resolution for the infraction dated January 20, 2021.[11]   (Ubuntu Affidavit at 1.)

---

[11] The infraction was written on January 20, 2022, not 2021.

## II.   *Analysis*

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citation omitted). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The plaintiff asserting a § 1983 claim has the burden of proof.  *See Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002).  Moreover, liability under § 1983 is "personal, based upon each defendant's own constitutional violations."  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Thus, a § 1983 claim requires factual detail about each defendant's personal involvement.  *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights and affirming dismissal of claim where plaintiff did not allege personal involvement by defendant).

The plaintiff in this case, Hicks, seeks damages from the defendants, Miller and Day, based on his claims that that they violated his constitutional rights by (1) allowing him to be exposed to alleged toxic black mold in the housing units at Red Onion and (2) retaliating against him in various ways for complaining about such mold.  I will address Hicks's claims in turn.  However, the court first must address the defendants' official capacity immunity argument.  Title 42 § U.S.C. applies only to persons acting under color of state law, and state officials sued in their official capacities are not "persons" within the meaning of § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  In his Complaint, Hicks states that "[a]ll parties are sued in their official and individual capacities."  (Complaint at 2.)  That being the case, to the extent that Hicks seeks monetary damages from Miller and Day in their official capacities, the Motion is granted.

### A.  Eighth Amendment Conditions of Confinement Claim

The Eighth Amendment protects prisoners from cruel and unusual living conditions.  *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  However, "the Constitution does not mandate comfortable prisons," and conditions that are "restrictive and even harsh … are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes*, 452 U.S. at 347-49.  In order to sustain a claim for cruel and unusual punishment due to conditions of confinement, a plaintiff must show (1) an objectively serious deprivation of a basic human need, that is, one causing serious physical or emotional injury or a grave risk of such harm; and (2) subjectively, that prison officials acted with "deliberate indifference to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted); *see also Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  In order to satisfy the first element, the prisoner must allege facts showing that the condition complained of was a "sufficiently serious" deprivation of a basic human need.  *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 298; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).  Only extreme deprivations will make out an Eighth Amendment claim, and it is the plaintiff's burden to produce facts sufficient to show that the risk from the conditions of his confinement was so grave that it violated contemporary notions of decency and resulted in serious or significant physical or emotional injury.  *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Strickler v. Waters*, 989 F.2d 1375, 1379-81 (4th Cir. 1993).  In order to satisfy the second element, the prisoner must allege facts showing that the defendants knew of circumstances from which an inference could be drawn that a "substantial risk of serious harm" was posed to the plaintiff's health and safety, that they drew that inference and then disregarded the risk posed. *Farmer*, 511 U.S. at 837.

Here, I find that Hicks's Complaint fails to present a dispute of material fact sufficient to survive a motion for summary judgment on his Eighth Amendment conditions of confinement claim. While the conditions Hicks describes are not ideal or desirable, the mere fact that Red Onion had some mold, without more, is insufficient to show that the conditions deprive him of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. It is important to note, additionally, that the defendants have provided evidence that the mold was not, in fact, toxic, black mold, but common environmental molds and common allergen molds. The defendants also have provided evidence that the airborne mold levels inside the facility were much lower than those outside the facility. Hicks has not refuted this evidence. He has made only a conclusory allegation that the mold was toxic, black mold without providing any support therefor. Other courts, including the Fourth Circuit Court of Appeals, have held that similar conditions to those described by Hicks did not violate the Eighth Amendment. *See Shrader v. White*, 761 F.2d 975, 984 (4th Cir. 1985) (finding no Eighth Amendment violation where the ceilings sometimes leaked, there was cold water in the cells, the shower heads dripped, and the shower area had mold and mildew); *Malone v. Francis*, No. CV 5:19-00146, 2019 WL 3026801, at *5 (S.D. W. Va. June 14, 2019) (dismissing Eighth Amendment claim based on a leaking window, the presence of black mold and the lack of cold water), *report and recommendation adopted*, No. 5:19-CV-00146, 2019 WL 3021804 (S.D. W. Va. July 10, 2019); *Mase v. Henry Cnty. Jail*, No. CIV.A. 7:06CV00627, 2006 WL 3091046, at *1 (W.D. Va. Oct. 27, 2006) (dismissing plaintiff's complaint where he alleged that mildew or mold was growing in the showers and "people" were "getting rashes," even assuming he was one of those people).

However, even if the court were to assume that Hicks's allegations sufficiently showed that the conditions deprived him of the "minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, I find that he, nonetheless, fails to allege facts demonstrating a dispute of material fact as to whether he suffered a sufficiently serious physical or emotional injury as a result of his exposure to mold, whether it be black mold or otherwise, at Red Onion.  In his Complaint, Hicks claims that the black mold caused irreparable harm to his respiratory system.  (Complaint at 3.)  He states he was assessed and treated by Medical for "sinus issues" due to problems related to the black mold sometime in February 2022.  (Complaint at 5.)  Hicks further claims he can be irreparably harmed in the future if the court does not stop the defendants from continuing their "customary" and "egregious" constitutional violations.  (Complaint at 5-6.)  Hicks alleges that, in a February 8, 2022, Written Complaint, he stated that his exposure to the toxic, black mold could lead to cancer later in life.  (Complaint at 3.)  In this Written Complaint, ROSP-22-INF-00201, Hicks states that the mold infestation could, over time, lead to "asbestosis, mesothelioma, and lung cancer."  (Docket Item No. 82-2 at 12.)  This is the entirety of Hicks's allegations regarding his injury due to the presence of mold at Red Onion.  Hicks has provided no medical documentation to support his claim that he was assessed and treated for sinus issues in February 2022 as a result of his exposure to the mold.  As stated herein, Hicks has the burden of proving his § 1983 claim. *See Oliver*, 250 F. Supp. 2d at 598.  Without more, the court cannot find that bare allegations of sinus issues rise to the level of a "serious or significant" physical injury. *Strickler*, 989 F.2d at 1381.

Moreover, although both the Supreme Court and the Fourth Circuit have indicated that a prisoner can bring an Eighth Amendment claim to challenge harm that is certain or very likely in the future, even when the harm has not yet

materialized, I cannot find that is the case here.[12]  Hicks merely asserts in his Complaint that he "can" be irreparably harmed in the future, and in the February 2022, Written Complaint, he simply asserts that his exposure to the toxic, black mold "could" cause cancer or some other malady at some future date.  Such vague and speculative assertions are insufficient to show a grave risk of serious or significant harm that rises to a constitutional level.

For these reasons, I find that Hicks has failed to sufficiently allege the existence of a disputed material fact with regard to the objective component of his Eighth Amendment conditions of confinement claim.  Given this finding, I further find it unnecessary to consider whether Hicks has done so with regard to the subjective component.  The court is cognizant of its obligation to construe pro se pleadings, such as Hicks's, liberally.  *See, e.g., Boag v. MacDougall*, 454 U.S. 364, 365 (1982).  "[L]iberal construction of pleadings is particularly appropriate where … there is a [p]ro se complaint raising civil rights issues."  *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978); *see also Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009).  Nevertheless, "[p]rinciples requiring generous construction of *pro se* complaints are not … without limits."  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  "A *pro se* plaintiff still must allege facts that state a cause of action."  *Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 575 (W.D.

---

[12] In *Helling v. McKinney*, the Supreme Court stated, "That the Eighth Amendment protects against future harm to inmates is not a novel proposition. … It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. 25, 33 (1993).  Similarly, in *Woodhous v. Virginia*, the Fourth Circuit stated that "[a] prisoner has a right, secured by the [E]ighth and [F]ourteenth [A]mendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief."  487 F.2d 889, 890 (4th Cir. 1973).

Va. Feb. 8, 2021) (quoting *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999)).

For all the reasons stated above, I will grant summary judgment in favor of defendants Miller and Day on Hicks's Eighth Amendment conditions of confinement claim.

*B. First Amendment Retaliation Claims*

Hicks alleges that defendants Miller and Day retaliated against him for exercising his First Amendment right to complain about the presence of mold at Red Onion.  In particular, he alleges that both Miller and Day failed to fix the mold issue, he was removed from his kitchen job and not reinstated, he had false disciplinary offenses placed against him, resulting in his removal from the PBU, and he was not returned to the PBU.

"Retaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper."  *Am. Civil Liberties Union v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993).  Although retaliation is not specifically referenced in the Constitution, it "is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."  *Wicomico Cnty.*, 999 F.2d at 785.  Relevant to this case, prison officials may not retaliate against an inmate for exercising his First Amendment right of access to the courts.  *See Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978).  Likewise, "inmates possess a First Amendment right to be free from retaliation for filing a grievance."  *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 546 (4th Cir. 2017) ("*Booker II*").  However, the

Fourth Circuit has cautioned that claims of retaliation against prison officials must be treated "with skepticism" because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct" or other concerning behaviors. *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

To prevail on a retaliation claim under § 1983, a plaintiff must establish three elements: "(1) … he engaged in protected First Amendment activity, (2) the defendant … took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) ("*Martin I*") (citations omitted). It is well-established that the filing of a grievance or a lawsuit is protected conduct that satisfies the first element. *See Booker II*, 855 F.3d at 541-42; *Hudspeth*, 584 F.2d at 1348.

With regard to the second element, the plaintiff is required to show that a defendant's allegedly retaliatory conduct caused "more than a *de minimis* inconvenience" and that it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). "This objective inquiry examines the specific facts of each case, taking into account the actors involved and their relationship." *Booker v. S.C. Dep't of Corrs.*, 583 F. App'x 43, 44 (4th Cir. 2014) (unpublished) ("*Booker I*"). Although "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity," *Constantine*, 411 F.3d at 500, it "is not dispositive of the question of whether such action would likely deter a person of ordinary firmness," *Martin I*, 858 F.3d at 250. The Fourth Circuit has recognized that filing a false

disciplinary charge against an inmate can satisfy the second element of a retaliation claim. *See Booker I*, 583 F. App'x at 44 (concluding that such conduct "would likely deter prisoners of ordinary firmness from exercising their First Amendment rights").

The third element of a retaliation claim requires the plaintiff to show that "there was a causal relationship between [his] protected activity and the defendant['s] conduct." *Martin I*, 858 F.3d at 249.  In *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) ("*Martin II*"), the Fourth Circuit held that the same-decision test set forth in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), an employment case, applies to inmates' retaliation claims.  "That test allocates a prima facie burden to the plaintiff to show that his protected activity was 'a substantial or motivating factor' in the defendants' action." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023) (quoting *Martin II*, 977 F.3d at 301).  "The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action in the absence of the plaintiff's protected activity." *Shaw*, 59 F.4th at 130 (citation omitted).  A plaintiff may meet his prima facie burden by showing "(1) that the defendants were aware of his engaging in protected activity and (2) some degree of temporal proximity to suggest a causal connection." *Shaw*, 59 F.4th at 130-31.  Conclusory assertions that a defendant acted with a retaliatory motive will not suffice.  *See Adams*, 40 F.3d at 74.

In his Complaint, Hicks alleges he was removed from his kitchen job at Red Onion in retaliation for his complaints of black mold in the kitchen.  In particular, he claims that, on January 20, 2022, the day he noticed the black mold infestation in the kitchen, he received a disciplinary offense and was suspended from his job "due to an incident on the job."  However, Hicks claims that because this disciplinary offense was resolved by informal resolution on February 3, 2022, his kitchen job

should automatically have been reinstated, per policy, but was not. Instead, he claims he continued to be denied a kitchen job because he "wrote up black mold."

I find that the defendants' Motion must be granted on this claim because Hicks fails to allege any personal involvement by either Miller or Day, the only remaining defendants, concerning his termination or the failure to rehire him. Instead, the evidence provided by the defendants makes clear it is Food Operations Director Almarode who recommended Hicks's termination from his kitchen job at Red Onion, and it also is Almarode who had the ultimate authority to rehire him. In particular, Almarode states he recommended Hicks be terminated from his line server job after Officer Bray charged Hicks, on January 20, 2022, with a 205 Disciplinary Offense, for Delaying and Hindering the serving of meals and attempting to hide a food cart with meal trays from staff. (Almarode Affidavit at 1-2.) Almarode states that an informal resolution was offered for this charge, and a 205 Disciplinary Offense would not have prevented Hicks from reapplying for his kitchen job. (Almarode Affidavit at 2.) Almarode also states that it is not unusual for inmates who have been terminated from the kitchen to be rehired. (Almarode Affidavit at 2.) Nonetheless, Almarode states he did not recall deciding not to rehire Hicks, and there was nothing in Hicks's paperwork to indicate he reapplied or was denied. (Almarode Affidavit at 2.)

Thus, the evidence is clear that it is Almarode who recommended Hicks's termination from his kitchen job at Red Onion. By Order entered February 13, 2023, all of Hicks's claims against Almarode were dismissed, and Almarode was terminated as a defendant in this action. (Docket Item No. 40.) Therefore, Hicks alleges no facts to support his claim that he was removed from / failed to be reinstated to his kitchen job in retaliation for his complaints about the presence of

black mold by either defendant Miller or Day.  As stated herein, liability under §
1983 is "personal, based upon each defendant's own constitutional violations."
*Trulock*, 275 F.3d at 402.  Because Hicks fails to identify any personal involvement
by either Miller or Day as to this retaliation claim, he fails to sufficiently allege a §
1983 claim against either of them.  That being the case, I will grant the defendants'
Motion on this claim and enter summary judgment in their favor.

Hicks also alleges that defendant Miller retaliated against him by making good
on a threat to place false infractions against him to get him moved out of the PBU,
located in the B Building, if he did not stop complaining about the presence of black
mold therein.  Specifically, Hicks alleges that, on April 18, 2022, Miller directed
Correctional Officer Edwards to write a disciplinary offense against him for having
his cell light covered, in retaliation for his black mold complaints.  According to
Hicks, it was his cellmate, Jamar Shelton, who had covered the light, and Shelton
admitted to doing the same.  Hicks did not provide an affidavit from Shelton, but he
provided a sworn Affidavit from fellow Red Onion inmate, Ubuntu, who stated the
defendants removed Hicks from the PBU after placing a false infraction against
Hicks.  (Ubuntu Affidavit at 1.)

In Miller's Affidavit, however, he denies retaliating against Hicks for his
complaints about mold in B Building.  (Miller Affidavit at 3.)  He also denies ever
threatening Hicks with false infractions or telling him to stop writing Complaints.
(Miller Affidavit at 3.)  Miller states that he would not want to work or be in an
environment with toxic, black mold.  (Miller Affidavit at 3.)  Miller states that, on
April 18, 2022, Hicks was charged with a 120B Disciplinary Offense, for having the
light fixture in his cell covered.  (Miller Affidavit at 2.)  According to the
Disciplinary Offense Report, which is attached to Miller's Affidavit, (Docket Item

No. 82-4 at 7-8), he, along with Major King and Sergeant Cornett, were conducting rounds when he noticed the cell light in Hicks's cell was covered.  (Miller Affidavit at 2; Docket Item No. 82-4 at 7.)  Upon questioning, Hicks admitted he was the one who covered the light.  (Miller Affidavit at 2; Docket Item No. 82-4 at 7.)  Based upon this admission, Hicks received the disciplinary charge.  (Miller Affidavit at 2-3.)  Miller stated that inmates are required to remain charge free while in the PBU.  (Miller Affidavit at 3.)  On April 28, 2022, as a result of this disciplinary offense making him ineligible to remain in the PBU, Hicks was moved to A Building.  (Miller Affidavit at 3.)

In light of the parties' conflicting sworn testimony, I cannot find that Miller is entitled to summary judgment on Hicks's retaliation claim against him.  *See Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) ("[W]here affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie.").  Here, the sworn testimony provided by Hicks and Miller creates factual disputes as to whether Miller placed false charges against Hicks for covering his cell light and as to whether Miller wrote the charge against him in retaliation for filing Written Complaints challenging his conditions of confinement.  These factual disputes must be resolved by a factfinder, which will have to assess the credibility of Miller, Hicks and other witnesses.  Therefore, I find that summary judgment is not appropriate, and the Motion will be denied with respect to the retaliation claim against Miller.

Lastly, Hicks alleges that defendant Day retaliated against him by failing to return him to the PBU when the hearing for his 120B Disciplinary Offense was not

held within the required 30-day timeframe per policy 861.1.[13]   (Complaint at 8.) Hicks further claims that Day ensured that Inmate Hearings Officer Adams found him guilty of the 120B Disciplinary Offense for which he was removed from the PBU.  (Complaint at 8.)  Hicks has provided no evidence to support this conclusory statement.

In his Affidavit, Day, the Unit Manager of A Building, states that he does not specifically recall Hicks, nor does he recall having any conversations with Hicks about his complaints of black mold in A Building.  (Day Affidavit at 2.)  Day states, however, that he did not retaliate against Hicks for writing Grievances or complaining about black mold at Red Onion.  (Day Affidavit at 2.)  He does not recall responding to any Grievances or Written Complaints from Hicks concerning mold.  (Day Affidavit at 2.)  Day states that he works in the areas Hicks complained about, and he would not want to work in an environment with toxic black mold. (Day Affidavit at 3.)  According to Day, in order to be eligible for the PBU, an inmate must either (1) remain charge-free, not necessarily conviction-free, for 12 months, or (2) remain charge free for six months and have a job in the kitchen.  (Day Affidavit at 2.)  Thus, according to Day, Hicks was not eligible to return to the PBU because he had incurred the 120B charge on April 18, 2022.  (Day Affidavit at 2.) In addition to eligibility, Day states he must collaborate with Miller, as the Unit Manager of B Building, to determine whether there is available bed space and a suitable cellmate for an inmate seeking assignment to the PBU.  (Day Affidavit at 2.)  At the time of Day's Affidavit in April 2023, the wait list for the PBU was 16 to 20 months for eligible inmate assignment to the PBU.  (Day Affidavit at 2.)  A wait list for the PBU is common, and there likely was one at the time Hicks alleges Day

---

[13] Hicks neither elaborates what "policy 861.1" is, nor does he provide a copy of this policy to the court.

should have returned him to the PBU, although Day does not know what the wait list was at that time. (Day Affidavit at 2.)

With regard to Hicks's claim that Day retaliated against him by ensuring that Inmate Hearings Officer Adams found Hicks guilty of the April 18, 2022, 120B charge, Day states that Hicks received this charge while housed in B Building. (Day Affidavit at 2.) That being the case, he states that he, as Unit Manager of A Building, had no involvement in writing or processing the charge. (Day Affidavit at 2.) Day states that, if the charge had been written in the A Building, as the Unit Manager, he would have been responsible for conducting the Institutional Review of the Inmate Hearings Officer's decision and penalty. (Day Affidavit at 2.) However, he neither reviewed the charge nor discussed any aspect of it with Inmate Hearings Officer Adams. (Day Affidavit at 2.)

Even assuming for argument's sake that Hicks can make a prima facie showing that his protected activity was a substantial or motivating factor in the defendants' action,[14] I find that Day has provided uncontradicted evidence to show he did not ensure that Adams found Hicks guilty. In particular, Day has provided to the court evidence corroborating his testimony that he, as Unit Manager of A Building, was not involved in writing or reviewing the charge that Hicks received while housed in B Building. All that Hicks has offered to the court is the bare assertion that Day ensured that Hearings Officer Adams found him guilty of the 120B charge without any factual or evidentiary support. Likewise, with regard to Hicks's claim that Day retaliated against him by failing to return him to the PBU,

---

[14] The temporal proximity between any protected activity and alleged retaliatory conduct is not clear on this claim. *See Shaw*, 59 F.4th at 130. Hicks has stated that he filed a Written Complaint about black mold in the A-1 Pod on April 28, 2022. It is not clear, however, when Hicks claims that Day should have returned him to the PBU.

Day testified that such a decision turns on multiple factors, one of which is eligibility, and the decision was not Day's alone.  Once Hicks received the 120B charge, he no longer was eligible to be housed in the PBU.  Aside from eligibility, there must be bed space available in the PBU, and there must be a suitable cellmate available for an inmate seeking assignment there.  Day testified that wait lists for assignment to the PBU were common, and in April 2023, the wait list was 16 to 20 weeks.  While Day did not know the length of the wait list at the time Hicks claims Day should have returned him there, Day testified there likely was one.  Day also testified that, in making the determinations associated with assigning an inmate to the PBU, he would have to consult with Miller, the Unit Manager of B Building.  Thus, a decision to return an inmate to the PBU would not be made solely by Day.

Based on the above, I find that Day has provided uncontradicted evidence that he did not engage in retaliatory conduct.  That being the case, I will enter summary judgment in his favor on this claim.

For the reasons set out herein, the Motion will be **GRANTED in part** and **DENIED in part**.

An appropriate Order will be entered.

**ENTERED**: October 16, 2024.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-26-